```
NMA:EAG/AL
F.#2011R01744
```

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - X

| | |
|---|---|
| UNITED STATES OF AMERICA | AMENDED COMPLAINT AND AFFIDAVIT IN SUPPORT OF ARREST WARRANT |
| -against- | (T. 18, U.S.C., § 894(a)(1)) |
| CARMINE PERSICO, | |
| Defendant. | |

- - - - - - - - - - - - - - - - - X

EASTERN DISTRICT OF NEW YORK, SS:

      SCOTT CURTIS, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation, duly appointed according to law and acting as such.

      Upon information and belief, in or about and between March 2010 and May 2010, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant CARMINE PERSICO, together with others, did knowingly and intentionally conspire to participate in the use of extortionate means to collect and attempt to collect an extension of credit from an individual affiliated with the Gambino organized crime family of La Cosa Nostra (hereinafter, "Gambino Individual #1").

      (Title 18, United States Code, Sections 894(a)(1) and 3551 et seq.)

The source of your deponent's information and the grounds for his belief are as follows:

1. I have been a Special Agent with the Federal Bureau of Investigation since 1996. During my tenure with FBI, I have been involved in various criminal investigations of organized crime. These investigations have utilized, among other investigative techniques, the use of physical and electronic surveillance, execution of search warrants, consensual recordings and debriefing of confidential sources. Through my training, education and experience, I have become familiar with organized crime activities, including illegal activities involving different forms of illegal gambling, loansharking and extortion, and the efforts of persons involved in such activity to avoid detection by law enforcement.

2. I am familiar with the facts and circumstances of this investigation from, among other things: (a) my personal participation in this investigation, (b) information obtained from cooperating witnesses, (c) information obtained from other law enforcement agents, (d) recordings made by cooperating witnesses, and (e) telephone records. Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I have hearsay knowledge. Because this affidavit is being

2

submitted for the limited purpose of establishing probable cause to arrest the defendant, I have not set forth each and every fact learned during the course of this investigation. Instead, I have set forth only those facts that I believe are necessary to establish probable cause for the arrest.

## THE COLOMBO ORGANIZED CRIME FAMILY

3. At all times pertinent to this complaint, the members and associates of the Colombo organized crime family of La Cosa Nostra constituted an "enterprise," as defined in Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact (hereinafter, the "Colombo crime family" and the "enterprise"). The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise. The Colombo crime family engaged in, and its activities affected, interstate and foreign commerce. The Colombo crime family was an organized criminal group that operated in the Eastern District of New York and elsewhere.

4. La Cosa Nostra operated through organized crime families. Five of these crime families - the Bonanno, Colombo, Gambino, Genovese and Luchese crime families - were headquartered in New York City and supervised criminal activity in New York, in other areas of the United States and, in some instances, in other countries. Another crime family, the Decavalcante crime family,

operated principally in New Jersey, but from time to time also in New York City.

5. The ruling body of La Cosa Nostra, known as the "Commission," consisted of leaders from each of the crime families. The Commission convened from time to time to decide certain issues affecting all of the crime families, such as rules governing crime family membership.

6. The Colombo crime family had a hierarchy and structure. The head of the Colombo crime family was known as the "boss." The Colombo crime family boss was assisted by an "underboss" and a counselor known as a "consigliere." Together, the boss, underboss and consigliere were the crime family's "administration." With the assistance of the underboss and consigliere, the boss was responsible for, among other things, setting policy and resolving disputes within and between La Cosa Nostra crime families and other criminal groups. The administration further supervised, supported, protected and disciplined the lower-ranking participants in the crime family. In return for their supervision and protection, the administration received part of the illegal earnings generated by the crime family. Members of the Colombo crime family served in an "acting" rather than "official" capacity in the administration on occasion due to another administration member's incarceration or ill health, or for the purpose of seeking to insulate another

4

administration member from law enforcement scrutiny. Further, on occasion, the Colombo crime family was overseen by a "panel" of crime family members that did not include the boss, underboss and/or consigliere.

7. Below the administration of the Colombo crime family were numerous "crews," also known as "regimes" and "decinas." Each crew was headed by a "captain," also known as a "skipper," "caporegime" and "capodecina." Each captain's crew consisted of "soldiers" and "associates." The captain was responsible for supervising the criminal activities of his crew and providing the crew with support and protection. In return, the captain often received a share of the crew's earnings.

8. Only members of the Colombo crime family could serve as a boss, underboss, consigliere, captain or soldier. Members of the crime family were referred to on occasion as "goodfellas" or "wiseguys," or as persons who had been "straightened out" or who had their "button." Associates were individuals who were not members of the crime family, but who nonetheless engaged in criminal activity for, and under the protection of, the crime family.

9. Many requirements existed before an associate could become a member of the Colombo crime family. The Commission of La Cosa Nostra from time to time limited the number of new members that could be added to a crime family. An

5

associate was also required to be proposed for membership by an existing crime family member. When the crime family's administration considered the associate worthy of membership, the administration then circulated the proposed associate's name on a list given to other La Cosa Nostra crime families, which the other crime families reviewed and either approved or disapproved. Unless there was an objection to the associate's membership, the crime family then "inducted," or "straightened out," the associate as a member of the crime family in a secret ceremony. During the ceremony, the associate, among other things: swore allegiance for life to the crime family above all else, even the associate's own family; swore, on penalty of death, never to reveal the crime family's existence, criminal activities and other secrets; and swore to follow all orders issued by the crime family boss, including swearing to commit murder if the boss directed it.

### Methods and Means of the Enterprise

10. The principal purpose of the Colombo crime family was to generate money for its members and associates. This purpose was implemented by members and associates of the Colombo crime family through various criminal activities, including drug trafficking, robbery, extortion, fraud, illegal gambling and loansharking. The members and associates of the Colombo crime family also furthered the enterprise's criminal activities by

6

threatening economic injury and using and threatening to use physical violence, including murder.

11. Although the primary purpose of the Colombo crime family was to generate money for its members and associates, the members and associates at times used the resources of the family to settle personal grievances and vendettas, sometimes with the approval of higher-ranking members of the family. For those purposes, members and associates of the enterprise were asked and expected to carry out, among other crimes, acts of violence, including murder and assault.

12. The members and associates of the Colombo crime family engaged in conduct designed to prevent government detection of their identities, their illegal activities and the location of proceeds of those activities. That conduct included a commitment to murdering persons, particularly members or associates of the crime families, who were perceived as potential witnesses against members and associates of the enterprise.

13. Members and associates of the Colombo crime family often coordinated criminal activity with members and associates of other organized crime families.

THE DEFENDANT

14. At various times relevant to this Complaint, the defendant CARMINE PERSICO was a long-time associate of the Colombo crime family. In 2005, the defendant CARMINE PERSICO,

7

together with his brother Theodore Persico, Jr., were charged in United States District Court for the Eastern District of New York with, among other crimes, participating in a conspiracy to use extortionate means to collect and attempt to collect extensions of credit from two individuals identified in the indictment as John Doe #1 and John Doe #2. CARMINE PERSICO thereafter pleaded guilty to the conspiracy to use extortionate means to collect extensions of credit to the two individuals, and was sentenced to a 19-month term of incarceration. CARMINE PERSICO's brother, Theodore Persico, Jr., pleaded guilty to participating in the same conspiracy.

### EXTORTION CONSPIRACY

15. As described herein, there is probable cause to believe that the defendant CARMINE PERSICO, together with others, including Colombo crime family members Theodore Persico, Jr., and Anthony Russo ("Russo"), conspired to participate in the use of extortionate means to collect and attempt to collect an extension of credit from Gambino Individual #1.

16. Court records reveal that on or about March 9, 2010, Theodore Persico, Jr., was arrested and detained in connection with an indictment charging, <u>inter alia</u>, racketeering conspiracy. Theodore Persico, Jr., remains incarcerated to date.

8

A. <u>INFORMATION FROM ANTHONY RUSSO</u>

17. Russo, who is now cooperating with the government has advised as follows, in sum and substance and in part:[1]

a. Prior to the March 2010 arrest of Theodore Persico, Jr., who is also known as "Teddy," Theodore Persico, Jr., was a member of the Colombo crime family and held the position of captain. In or about and between March 2010 and May 2010, Anthony Russo was also a member of the Colombo crime family. In or about June 2010, Russo was elevated to the position of acting captain for Theodore Persico, Jr., who was then incarcerated.

b. After the arrest of Theodore Persico, Jr., the defendant CARMINE PERSICO sought assistance from Russo to collect a debt owed by an individual affiliated with the Gambino organized crime family of La Cosa Nostra (the "Gambino family"). Specifically, CARMINE PERSICO advised CW-1 that a bookmaker named "Marc" who resided in Connecticut (hereinafter, "Marc the bookmaker") had placed a bet on behalf of a third individual, with someone affiliated with the Gambino family ("Gambino

---

[1] Russo has pled guilty, pursuant to a cooperation agreement with the United States Attorney's Office for the Eastern District of New York, to racketeering conspiracy, including murder as a predicate racketeering act. In exchange for his cooperation, Russo is hoping to receive leniency at sentencing and admission into the Witness Security program. The information provided by Russo regarding La Cosa Nostra activities in New York has been corroborated in numerous ways, including by information from other confidential sources, cooperating witnesses, consensual recordings and other physical evidence.

9

Individual #1"), but that Gambino Individual #1 refused to pay the winnings when the bet was a winning one. The defendant CARMINE PERSICO further explained to CW-1 that prior to his arrest, Theodore Persico, Jr., had determined that Gambino family member Louis Filipelli was providing protection to Gambino Individual #1.

    c. Thereafter, at the defendant CARMINE PERSICO's request, Russo and an associate of the Colombo crime family, who unbeknownst to members and associates of organized crime was cooperating with the government (hereinafter, "CW-1"),[2] met with Filipelli at a restaurant in New York, New York. There, Russo advised Filipelli about the situation involving Marc the bookmaker and Filipelli agreed to obtain $10,000 from Gambino Individual #1.

    d. Russo, CW-1 and Filipelli subsequently met at another restaurant in New York, New York, where Filipelli gave Russo $7,500 as an initial payment on the money owed to Marc the bookmaker. Later that night, Russo provided $5,000 to the

---

[2] CW-1 has pled guilty, pursuant to a cooperation agreement with the United States Attorney's Office for the Eastern District of New York, to racketeering conspiracy, including murders as predicate racketeering acts. In exchange for his cooperation, CW-1 is hoping to receive leniency at sentencing and admission into the Witness Security program. The information provided by CW-1 regarding La Cosa Nostra activities in New York has been corroborated in numerous ways, including by information from other confidential sources, cooperating witnesses, consensual recordings and other physical evidence.

defendant CARMINE PERSICO and split the remaining $2,500 with CW-1.

B. <u>CONSENSUAL RECORDINGS MADE BY CW-1</u>

18. On or about March 9, 2010, the day that Theodore Persico, Jr., was arrested, CW-1, who was equipped with a recording device, met with Russo in Staten Island, New York. CW-1 has advised that during the meeting, Russo told CW-1 that Russo and the defendant CARMINE PERSICO were instructed by Teddy Persico to collect a $14,000 gambling debt but that the defendant CARMINE PERSICO had attempted to collect the debt without Russo. A review of the recording made by CW-1 reveals that Russo told CW-1 "I [Russo] was supposed to go meet Louie [Filippelli] this morning . . . with Carmine." However, Russo explained on the consensual recording that the defendant CARMINE PERSICO said to Russo that he [CARMINE PERSICO] had instead told "Louie from Harlem," a reference to Louis Filippelli, that he would accept "half the money" to "settle" the whole dispute.

19. On or about March 26, 2010, Russo met with CW-1, who was equipped with a recording device, in Brooklyn, New York. On the recording made by CW-1, Russo advised CW-1 that "Carmine" [PERSICO] told "Teddy," [Theodore Persico, Jr.,] who told another individual, who said, "Go get me ten, keep four for yourself."

20. On or about April 10, 2010, CW-1, who was equipped with a recording device, drove Russo from Brooklyn to

11

Parlor Steakhouse at 1600 3rd Avenue, New York, New York, where they were planning to meet Louis Filippelli to discuss the $14,000 debt. During the car ride to steakhouse, Russo and CW-1 had the following consensually-recorded conversation:

> RUSSO: Found out where the other $6,000 went.
>
> CW-1: Where?
>
> RUSSO: Uh, he gave it to, uh, he gave it to the kid he wasn't supposed to give it to. He gave it to the kid that ran to them for the, the kid that they owed the money to.
>
> CW-1: What's he giving it to him for?
>
> RUSSO: So Carmine went, spoke up for him, told. So he gave the kid, the kid Nicky in Connecticut 6,000, told him, that's it, that's all you're getting.
>
> CW-1: They told him that?
>
> RUSSO: Carmine says, but Carmine's always fuckin' HB's -
>
> CW-1: You can't listen to him.
>
> RUSSO: Fuckin' GHBd out all the time.
>
> CW-1: So he don't know what he's saying.
>
> RUSSO: Talking to me before. Said, Carmine, I don't know. I'm gonna tell him, listen, the situation with Teddy, with his brother, with the money, the kid in Connecticut, what's up with that?
>
> CW-1: Just tell him, say, listen, Carmine had no authority to -

12

> RUSSO: Well, if he says, Carmine, I'm gonna tell him, who's Carmine, you know Carmine? He's gonna say, that's Teddy's brother. I'm gonna tell him, But who the fuck is he? He can't make deals. Who the fuck's he making a deal for?

* * *

> CW-1: Oh, Carmine's still looking to put it in his pocket?
>
> RUSSO: Well, Teddy's gotta get it and he's gonna give his brother some of it.

21. On or about May 13, 2010, CW-1, who was equipped with a recording device, drove with Russo from Staten Island to another restaurant in Manhattan, where they had a second meeting with Louis Filippelli, during which John Doe #1, an individual whose identity is known to the affiant, was also present. During the drive, Russo updated CW-1 about the status of the $14,000 debt. Russo told CW-1 that "Carmine [PERSICO] keeps calling me up, "Did you get my money?" Russo then advised CW-1 that Filippelli "found out later on that the kid did give $6,000." Russo then explained:

> Carmine. Teddy fuckin' met Louie, told him, you know, you better give him the [UI]. . . . Anyway, he gave 'im. He said, "Get me 10. Then take 2 and we're even." Said, "I don't want nothing. Never got back to him, one month, two months passed. Carmine was bugging out. Went down there. Was supposed to go with me. Teddy got pinched that morning. Instead of waiting for me, seen Louie, told Louie, instead of giving 6,500, 3,500, I'll squash it. What happened was Louie never got back to the kid. [UI] another

13

> wise guy in Connecticut. Louie never got
> back to him. That guy gave, Louie gave, the
> guy in Connecticut gave the kid 6,000. Told
> him, "Here's 6,000, that's all you're
> getting, you're getting nothing else." . . .
> So what happened was Louie never, the guy
> never told Louie he gave him 6, the guy took
> the 6, told Carmine, they gave me 6,000
> already. They're saying that's it. . . .
> That's not it. It's 14. It's fourteen five.
> Before that, the kid lost 16,000, 20,000, and
> he paid it. It took him two, three weeks to
> give it to him but he paid it. . . I told
> Louis you got to come up with at least 10
> . . . My friend wants 10, it was fourteen
> five, he wants 10. . . . I figured if he
> gives 4,000, I'll give Carmine two and we can
> take a thousand each.

22. On Saturday, May 22, 2010, CW-1, who was again equipped with a recording device, met with Russo and the defendant CARMINE PERSICO in Brooklyn. Russo told CW-1 that they would offer to take Louis Filippelli to the club "Sugar" in Long Island on Thursday evening [May 27, 2010] after they meet Filippelli at Coppola's Restaurant in Manhattan. Russo told the defendant CARMINE PERSICO:

> I'm going, you're coming with me; you're
> gonna meet me there Thursday. This way, I
> can give you that thing.

After the defendant CARMINE PERSICO departed, Russo commented:

> Now, listen to this, Teddy sends me a
> message. I heard you [Russo] got that thing
> from Louie. Give Carmine [UI], give me a
> thousand. I need it for my girl, bad.

23. On Thursday, May 27, 2010, Russo and CW-1, who was equipped with a recording device, met Filippelli at Coppola's

14

Restaurant and they thereafter traveled to Sugar, where they met the defendant CARMINE PERSICO, among others. Filippelli gave Russo $5,000 which represented the balance of the payments from the gambling. Russo told CW-1 that he had to give $4,000 to the defendant CARMINE PERSICO who was supposed to forward it to Theodore Persico, Jr., to help pay for his attorney and then gave CW-1 $300 for helping arrange the meetings with Filippelli.

* * *

24. In light of the information provided by Russo and CW-1 and the consensual recordings, there is probable cause to believe that the defendant CARMINE PERSICO knowingly and intentionally conspired to participate in the use of extortionate means to collect and attempt to collect an extension of credit from Gambino Individual #1.

25. Because public filing of this document could result in a risk of flight by the defendant, as well as jeopardize the government's investigation, your deponent respectfully requests that the complaint and arrest warrant be filed under seal.

WHEREFORE, your deponent respectfully requests that an arrest warrant be issued for the defendant CARMINE PERSICO so that he may be dealt with according to law.

Dated:  Brooklyn, New York
        October 24, 2011

_____
SCOTT CURTIS
Special Agent
Federal Bureau of Investigation

Sworn to before me this
24th day of October, 2011

_____
THE HONORABLE RAMON E. REYES, JR.
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK